1  RON BENDER (SBN 143364)
   BETH ANN R. YOUNG (SBN 143945)
2  MONICA Y. KIM (SBN 180139)
   JULIET Y. OH (SBN 211414)
3  ROBERT M. CARRASCO (SBN 334642)
   LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
4  2818 La Cienega Avenue
   Los Angeles, California 90034
5  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
6  Email: rb@lnbyg.com; bry@lnbyg.com; myk@lnbyg.com; jyo@lnbyg.com; rmc@lnbyg.com
7
8  Attorneys for Chapter 11 Debtors and Debtors in Possession

9              **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
10              **SAN FERNANDO VALLEY DIVISION**

11 | In re:                                    | Lead Case No.: 1:23-bk-11200-VK |
   | :--- | :--- |
12 | Windsor Terrace Healthcare, LLC, *et al.*, | Jointly administered with Case Nos. |
   |                                           | 1:23-bk-11201-VK; 1:23-bk-11212-VK; |
13 |         Debtors and Debtors in Possession. | 1:23-bk-11202-VK; 1:23-bk-11213-VK; |
   |                                           | 1:23-bk-11203-VK; 1:23-bk-11214-VK; |
14 | ———————————————————— | 1:23-bk-11204-VK; 1:23-bk-11215-VK; |
   |                                           | 1:23-bk-11206-VK; 1:23-bk-11216-VK; |
15 | ☒ Affects All Debtors                      | 1:23-bk-11207-VK; 1:23-bk-11217-VK; |
   | ☐ Affects S&F Home Health Opco I, LLC      | 1:23-bk-11208-VK; 1:23-bk-11218-VK; |
16 | ☐ Affects S&F Hospice Opco I, LLC          | 1:23-bk-11209-VK; 1:23-bk-11219-VK; |
17 | ☐ Affects S&F Market Street Healthcare, LLC | 1:23-bk-11210-VK; 1:23-bk-11220-VK; |
   | ☐ Affects Windsor Care Center National City, | 1:23-bk-11401-VK; 1:23-bk-11402-VK |
18 | Inc.                                       | |
   | ☐ Affects Windsor Cheviot Hills, LLC       | Chapter 11 Cases |
19 | ☐ Affects Windsor Country Drive Care Center, | |
   | LLC                                        | **NOTICE OF OMNIBUS MOTION** |
20 | ☐ Affects Windsor Court Assisted Living, LLC | **AND OMNIBUS MOTION BY** |
21 | ☐ Affects Windsor Cypress Gardens Healthcare, | **DEBTORS PURSUANT TO 11 U.S.C.** |
   | LLC                                        | **§§ 105 AND 502(c) FOR ESTIMATION** |
22 | ☐ Affects Windsor El Camino Care Center, LLC | **OF UNLIQUIDATED CLAIMS FOR** |
   | ☐ Affects Windsor Elk Grove and Rehabilitation, | **VOTING PURPOSES ONLY AS TO** |
23 | LLC                                        | **THOSE PROOFS OF CLAIMS** |
   | ☐ Affects Windsor Elmhaven Care Center, LLC | **("POC") FILED BY CLAIMANTS:** |
24 | ☐ Affects Windsor Gardens Convalescent      | |
   | Hospital, Inc.                             | **1. MORENO [POC NO. 69]** |
25 | ☐ Affects Windsor Hampton Care Center, LLC  | **2. GRIGSBY [POC NO. 2-1]** |
26 | ☐ Affects Windsor Hayward Estates, LLC      | **3. HERNANDEZ [POC NO. 85]** |
   | ☐ Affects Windsor Monterey Care Center, LLC | **4. RILEY [POC NO. 69]** |
27 | ☐ Affects Windsor Rosewood Care Center, LLC | **5. MADSEN [POC NO. 13-1]** |
   | ☐ Affects Windsor Sacramento Estates, LLC   | **6. PRZEBINDA / GROSS [POC NO.** |
28 | ☐ Affects Windsor Skyline Care Center, LLC  | **68-1]** |

| | |
|---|---|
| ☐ Affects Windsor Terrace Healthcare, LLC<br>☐ Affects Windsor The Ridge Rehabilitation Center, LLC<br>☐ Affects Windsor Vallejo Care Center, LLC | **7. MELARAGNO, RINGGOLD and LOCKHART [POC NOS. 143, 144, 146]**<br>**8. ORRICK [POC NO. 34-1]**<br>**DECLARATION OF CLARO BUDGIE AMPARO AND COMPENDIUM OF EXHIBITS FILED CONCURRENTLY HEREWITH** |

**Hearing Information**:

| | |
|---|---|
| Date: | July 19, 2024 |
| Time: | 10:00 a.m. |
| Place: | Courtroom 301 |
| | 21041 Burbank Boulevard |
| | Woodland Hills, CA 91367 |
| | (and via ZoomGov) |

**TO THE HONORABLE VICTORIA KAUFMAN, UNITED STATES BANKRUPTCY JUDGE AND TO CLAIMANTS MORENO, GRIGSBY, HERNANDEZ, RILEY, MADSEN, PRZBINDA, GROSS, MELARAGNO LOCKHART, RINGGOLD AND ORRICK AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 19, 2024 at 10:00 a.m. in Courtroom 301 of the above captioned Bankruptcy Court located at 21041 Burbank Boulevard, Woodland Hills, CA 91367, a hearing will be held before the Honorable Victoria Kaufman, United States Bankruptcy Judge, to consider the motion (the "Motion") filed by Chapter 11 Debtors and Debtors-in-possession in the above-captioned jointly administered chapter 11 bankruptcy cases of Windsor Terrace Healthcare, LLC, S&F Home Health Opco I, LLC, S&F Hospice Opco I, LLC, S&F Market Street Healthcare, LLC, Windsor Care Center National City, Inc., Windsor Cheviot Hills, LLC, Windsor Country Drive Care Center, LLC, Windsor Court Assisted Living, LLC, Windsor Cypress Gardens Healthcare, LLC, Windsor El Camino Care Center, LLC, Windsor Elk Grove and Rehabilitation, LLC, Windsor Elmhaven Care Center, LLC, Windsor Gardens Convalescent Hospital, Inc., Windsor Hampton Care Center, LLC, Windsor Hayward Estates, LLC, Windsor Monterey Care Center, LLC, Windsor Rosewood Care Center, LLC, Windsor Sacramento Estates, LLC, Windsor Skyline Care Center, LLC, Windsor

The Ridge Rehabilitation Center, LLC, and Windsor Vallejo Care Center, LLC, the debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 bankruptcy cases (collectively, the "Debtors") pursuant to 11 U.S.C. §§ 105 and 502(c), to estimate for voting purposes only the disputed and unliquidated claims filed by:

1. Nicholas Martin Moreno and Nicholas Mariano Moreno (the "Moreno Claim") [POC NO. 69][1];

2. Timothy Grigsby and Luckie Grigsby (the "Grigsby Claim") [POC NO. 2-1];

3. Sergio O. Hernandez (the "Hernandez Claim") [POC NO. 85]

4. Terrence Riley (the "Riley Claim") [POC NO. 69];

5. Nora Madsen and Betsy Madsen (the "Madsen Claim") [POC NO. 13-1];

6. Irene Przebinda and Sophia Gross (the "Gross Claim") [POC NO. 68-1];

7. Eddye Melargano, Justin Ringgold-Lockhart and Nina Ringgold (the "Melargano Claim") [POC NOS. 143, 144 and 146]; and

8. Jerry Orrick and Joe Orrick (the "Orrick Claim") [POC NO. 34-1].

The claims identified in items 1 – 8 above are referred to herein collectively as the "Resident Claims," or individually by name for purposes of voting in connection with Debtors' Plan of Reorganization (filed April 16 2024 and amended on June 5, 2024 and June 11, 2024), and as it may be further amended or modified from time to time (the "Plan").

**PLEASE TAKE FURTHER NOTICE** that the Motion seeks to alter the rights of the Resident Claims by estimating each of the Resident Claims at the amount set forth in the Disclosure Statement [Dkt. No. 794] which amount is also set forth herein, or as otherwise determined by the Court, based upon the grounds set forth in the Motion.

---

[1] Just prior to the filing of this Motion Debtor and the Moreno Claimants reached a resolution of the amount of an allowed unsecured claim for both voting and distribution purposes for the Moreno Claim, which is still subject to documentation. It is anticipated that Notice of the Stipulation will be filed shortly, and assuming no objection after the passage of seven days, that an Order approving the Stipulation Regarding the Moreno Claim will be entered prior to the hearing on this Motion, at which point, Debtor will withdraw this Motion as to the Moreno Claim and the Moreno Claim will be treated in accordance with the Stipulation and Order thereon.

**PLEASE READ THIS DOCUMENT CAREFULLY TO DETERMINE THE BASIS FOR THE DEBTORS' ESTIMATION OF YOUR CLAIM.**  The specific grounds for the Motion are set forth in detail in the attached Memorandum of Points and Authorities.

The Motion is based upon 11 U.S.C. §§ 105 and 502(c), this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Claro Budgie Amparo ("Amparo Declaration") and the Compendium of Exhibits which contain the Proofs of Claims which are the subject of this Motion, filed concurrently herewith and all exhibits attached thereto, the entire record of these cases, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court on the Motion.

**PLEASE TAKE FURTHER NOTICE** that unless otherwise ordered by the Court, Local Bankruptcy Rules 3007-1(b)(3)(A) and 9013-1(f) require that any opposition or other response to the Motion must be in writing and filed with the Clerk of the Court and served upon counsel for Debtors at the address set forth in the upper left-hand corner of the first page hereof not later than fourteen (14) days prior to the hearing date.  Pursuant to Local Bankruptcy Rule 3007-1(b)(3)(B) and Local Bankruptcy Rule 9013-1(h), the Court may deem the failure of a party in interest to file a timely response to the Motion to constitute consent to the granting by the Court of the relief requested by the Debtors in the Motion.

Dated:  June 21, 2024          **LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.**


By: _____
RON BENDER
BETH ANN R. YOUNG
MONICA Y. KIM
JULIET Y. OH
ROBERT M. CARRASCO
Attorneys for Debtors and Debtors in Possession

# <u>TABLE OF CONTENTS</u>

I.      Summary of Argument ................................................................................. 1

II.     Statement of Relevant Facts ......................................................................... 3

III.    The Bankruptcy Court Is Required To Estimate Claims Under Section
        502(c) For VOTING Purposes In Order To Avoid Undue Delay In the
        Administration Of The Case .......................................................................... 5

        A.   The Resident Claims Are All Contingent And Unliquidated
             Claims ................................................................................................... 6

        B.   Awaiting Resolution Of The Resident Claims In Another Court
             Would Unduly Delay The Administration Of The Debtors'
             Bankruptcy Cases. ............................................................................... 7

        C.   The Bankruptcy Court Has Wide Discretion In Choosing The
             Method Of Estimating Claims Under 11 U.S.C. § 502(c). ................... 8

        D.   The Resident Claims Should Be Estimated At The Proposed
             Amounts Set Forth In The Disclosure Statement ................................. 9

IV.     The Resident Claims Cannot Meet Their Burden Of Proof For Either
        Elder Abuse Or Gross Negligence ................................................................ 5

        A.   Elder Abuse Claims ............................................................................ 11

        B.   Negligence/Wrongful Death Resident Claims .................................... 14

V.      Summary of Resident Claimants' Claims and Medical Condition ................. 15

VI.     Conclusion .................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Addison v. Langston (In re Brints Cotton Mktg., Inc.)*,
  737 F.2d 1338 (5th Cir. 1984) ................................................................ 9

*In re Aspen Limousine Serv., Inc.*,
  193 B.R. 325 (Bankr. D. Colo. 1996) ..................................................... 8

*Beaumont v. Durkay (In re Ford)*,
  967 F.2d 1047 (5th Cir. 1992) ................................................................ 7

*Bittner v. Borne Chem. Co., Inc.*,
  691 F.2d 134 (3d Cir. 1982) ................................................... 5, 8, 9, 10

*In re Continental Airlines Corp.*,
  60 B.R. 903 (Bankr. S.D. Tex. 1986) ..................................................... 7

*In re Continental Airlines, Inc.*,
  57 B.R. 842 (Bankr. S.D. Tex. 1985) ..................................................... 8

*In re Corey*,
  892 F.2d 829 (9th Cir. 1989) ............................................................. 8, 9

*In re Eagle Bus Mfg., Inc.*,
  158 B.R. 421 (S.D. Tex. 1993) ............................................................... 8

*In re Falk*,
  2013 WL 5405564 (B.A.P. 9th Cir. 2013) ............................................. 6

*In re Farley, Inc.*,
  146 B.R. 748 (Bankr. N.D. Ill. 1992) ..................................................... 9

*In re Frontier Airlines, Inc.*,
  137 B.R. 811 (D. Colo. 1992) ....................................................... 5, 6, 10

*Interco Incorporated v. ILGWU Nat'l Retirement Fund (Matter of Interco, Inc.)*,
  137 B.R. 993 (Bankr. E.D. Mo. 1992) ................................................... 7

*In re Lane*,
  68 B.R. 609 (Bankr. D. Hawaii 1986) .................................................... 9

*Mazzeo v. United States (In re Mazzeo)*,
  131 F.3d 295 (2nd Cir. 1997) ................................................................. 6

*In re Nicholes*,
  184 B.R. 82 (B.A.P. 9th Cir. 1995) ........................................................ 6

*In re Pac. Gas & Elec. Co.*,
  295 B.R. 635 (Bankr. N.D.Cal. 2003) ................................................................ 5

*In re Quintana*,
  107 B.R. 234 (B.A.P. 9th Cir. 1989) .................................................................. 6

*In re Rhead*,
  179 B.R. 169 (Bankr. D. Ariz. 1995) ................................................................. 7

*In re Sylvester*,
  19 B.R. 671 (B.A.P. 9th Cir. 1982) .................................................................... 6

*In re Thomson McKinnon Securities, Inc.*,
  143 B.R. 612 (Bankr. S.D.N.Y. 1992) ............................................................... 9

*In re Trident Shipworks, Inc.*,
  247 B.R. 513 (Bankr. M.D. Fla. 2000) ............................................................ 5, 6

*In re Windsor Plumbing Supply Co., Inc.*,
  170 B.R. 503 (Bankr. E.D.N.Y. 1994) ............................................................... 9

**California Cases**

*Carter v. Prime Healthcare Paradise Valley LLC* (2011)
  198 Cal.App.4th 396 ..................................................................... 13, 14, 18, 21

*Covenant Care, Inc. v. Superior Court* (2004)
  32 Cal.4th 771 ................................................................................................ 12

*Delaney v. Baker* (1999)
  20 Cal.4th 23 ....................................................................................... 12, 19, 21

*Sababin v. Superior Court* (2006)
  144 Cal.App.4th 81 ................................................................................... 19, 21

*Spencer v. Beatty Safeway Scaffold Company* (1956)
  141 Cal.App.2d 875 ....................................................................................... 15

*Winn v. Pioneer Medical Group, Inc.* (2016)
  63 Cal.4th 148 ................................................................................................ 12

*Worsham v. O'Connor Hospital* (2014)
  226 Cal.App.4th 331 ...................................................................................... 12

**Other State Statutes**

Welf. & Inst. Code
  §§ 15610.07(a) and (b) ............................................................................. 18, 21
  § 15610.57(b) ................................................................................................ 11
  § 15657 ............................................................................................. 4, 12, 21

*Welfare & Institutions Code*
   § 15657.2 ................................................................................................ 12, 18, 21

Welfare and Institutions Code
   § 15600 et seq. ......................................................................................................... 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## SUMMARY OF ARGUMENT

By this Motion, the Debtors seek an order of the Court estimating the Moreno Claim, Grigsby Claim, Hernandez Claim, Riley Claim, Madsen Claim, Gross Claim, Melaragno Claim and Orrick Claim (collectively referred to herein as the "Resident Claims," the "Resident Claimants" or individually by name) for purposes of voting on Debtors' pending Plan of Reorganization (Dated April 16, 2024 [Docket No. 793], as amended on June 5, 2024 [Docket No. 1043] and June 11, 2024 [Docket No. 1077]) and as may be thereafter modified (the "Plan").

The Debtors' Plan is structured to offer the Resident Claimants holding a disputed and unliquidated claim an allowed unsecured claim amount designed to expedite the confirmation of a plan. The Plan is also structured to avoid potentially costly and protracted litigation of the highly disputed Resident Claims which would still be subject to the two payment options set forth in the Plan.[2] In the Debtors' Disclosure Statement [Docket No. 794] (and as amended on June 5, 2024 [Docket No. 1044] and June 11, 2024 [Docket No. 1079]), the Debtors set forth in settlement, a proposed estimated claim amount for each of the Resident Claims,[3] recognizing

---

[2] The Plan provides, *inter alia*, that each holder of a Class 4 allowed claim (which includes the Resident Claims) have the option of selecting either (1) six payments under the Plan over 5 years equal to 32% of the amount of their Class 4 allowed claim; or (2) a single payment under the Plan on the Effective Date equal to 10% of their Class 4 allowed claim. Thus, even if any Resident Claimant elects to proceed to a trial to liquidate their disputed claim, once liquidated, that claim would be subject to these two options.

[3] The Debtors provided estimation proposals to 33 of the 40 residents (and/or their representatives) in the Disclosure Statement. As of the filing of this Motion, there were already 7 settled resident claims, plus the Debtors have reached a resolution with an additional 8 resident claimants (and/or their representatives) for a total of 15 resident claimants holding an allowed claim for both voting and distribution purposes under the Plan (or any Plan as amended) (the "Settled Resident Claims"); and the Debtors have likely reached a resolution with members of the Ad Hoc Group consisting of another 16 resident claimants (and/or their representatives) for estimation of their claim for the limited purpose of voting under the Plan (or any Plan as amended) (the "Voting Resident Claims"). The Resident Claimants which are the subject of this Motion are the last 8 remaining Resident Claimants (or 7 excluding the Moreno Claim) who have not reached an agreement with the Debtors as to the amount of an allowed unsecured claim for any purpose.

that the Debtors could possibly have eliminated or achieved additional reductions in the disputed Resident Claims through litigation, but instead endeavoring to provide a higher estimated claim amount in the context of a settlement and the Plan in order to avoid the further costs and delay inherent in protracted litigation of highly disputed claims.

The Debtors have proposed in the Plan, for settlement purposes only, an allowed unsecured claim in favor of the Resident Claimants in the following amounts:

| | NAME OF CLAIMANT | AMOUNT OF PROPOSED ALLOWED UNSECURED CLAIM |
|---|---|---|
| 1. | Nicholas Martin Moreno and Nicholas Mariano Moreno ("Moreno Claim") [POC No. 69] | $100,000.00 |
| 2. | Timothy Grigsby and Luckie Grigsby ("Grigsby Claim") [POC No. 2-1] | $50,000.00 |
| 3. | Sergio O. Hernandez ("Hernandez Claim") [POC No. 85] | $50,000.00 |
| 4. | Terrence Riley ("Riley Claim") [POC No. 69] | $100,000.00 |
| 5. | Nora Madsen and Betsy Madsen ("Madsen Claim") [POC No. 13-1] | $50,000.00 |
| 6. | Irene Przebinda and Sophia Gross ("Gross Claim") [POC No. 68-1] | $50,000.00 |
| 7. | Eddye Melargano, Justin Ringgold-Lockhart and Nina Ringgold ("Melargano Claim") [POC Nos 143, 144 and 146]; | $0.00 |
| 8. | Jerry Orrick and Joe Orrick ("Orrick Claim") [POC No. 34-1] | $50,000.00 |

As of the filing of this Motion, the Resident Claimants have not accepted the amounts set forth above as proposed in the Plan.  Accordingly, through this Motion, Debtors seek to estimate the Resident Claimants' proofs of claims in the amounts set forth above, *for voting purposes only*.  Without estimation of these Resident Claims, the amount of each of the Resident Claims herein are largely unknown because they are either alleged to be "subject to proof at trial" or in

an "unknown" amount that remains disputed and has not been liquidated.  Indeed, many of the Resident Claims fail to state any amount of alleged damages in their Proof of Claim, and the Resident Claimants that do state an amount of alleged damages have not provided any foundational evidence to make that determination, nor has that evidence been adjudicated by any Court. Thus, it is unclear how this Court could even treat these particular Resident Claims for voting purposes under the Plan unless such Resident Claims are estimated *prior to such time* as voting on the Plan becomes available.  This is exactly the type of situation 11 U.S.C. § 502(c) is intended to address.

## II.

## STATEMENT OF RELEVANT FACTS

Debtors contend that they provided the appropriate standard of care to each of the Resident Claimants and that the Resident Claims are factually and legally disputed.  However, in settlement, to avoid the cost of protracted disputed litigation, the Debtors have proposed an unsecured allowed claim amount (whether in settlement of the claim for all purposes, or for voting purposes only) for each of the Resident Claims as set forth in the table above for purposes of facilitating voting and confirmation of Debtors' Plan.

In determining the estimated amounts, a number of factors were taken into consideration, including but not limited to: (1) the nature of the alleged injury; (2) the claimant's pre-existing conditions and morbidity at the time of admission to the facility; (3) the length of time the claimant was at the facility; (4) the claimant's evidentiary support to date for the allegations in the complaint if one was filed, or in any timely filed proof of claim; (5) the records maintained by the facility and any notes relating to the claimant's claim; (6) application of the statutory MICRA cap on any alleged damages; (7) the facility's affirmative defenses to the alleged Claims; (8) the value of any settlements or recovery after trial relating to similar alleged Claims; and (9) the procedural posture of any pending litigation regarding the claimant's Claim, including whether there are other parties alleged to be responsible for the claimant's Claim, and thus, other potential sources of recovery.

In addition to this level of analysis, the Debtors also had each Claim[4] reviewed by internal personnel who are familiar with the facilities and typical claims alleged by similarly situated claimants and where the claimant's Claim presented falls within a range of damages typically associated with such Claims, if established.  From there, using the above criteria, the Debtors classified each unliquidated Personal Injury Claim, with those Claims denominated in the low, medium or high range of severity, if established.  Each Resident Claimant could then review the specific information considered by the Debtors in assessing their individual claim and determining the amount of the proposed allowed unsecured claim settlement amount as set forth in the Disclosure Statement. The analysis of each Resident Claim which was filed with the Disclosure Statement is attached to the Amparo Declaration as Exhibits "A" through "H."

Each of the Resident Claims are the subject of now pending, but stayed, litigation as to the Debtors wherein there are other defendants who are potentially liable for the damages alleged.  These other lawsuits can take several years to resolve and the cost to litigate these Resident Claims could exceed the amount of any potential distribution proposed to the Resident Claimants under the Plan on account of such Resident Claimant's unliquidated claim. This is especially true where there is no guarantee that any of the Resident Claimants will prevail on their claim,[5] or that they will recover significant damages against the Debtors if they do state a claim. Indeed, quite often, claims similar to the Resident Claims here do not meet their burden of proof or recover little in a settlement akin to "nuisance value." For example,

---

[4] True and correct copies of each of the Proofs of Claims filed on the Claims Docket that are the subject of this Motion are attached to the Compendium of Exhibits as Exhibits "A" through "H."

[5] As discussed further below, all but one of the Resident Claims seek to recover on claims alleging "elder neglect" which elements are set by statute.  And, if they seek attorneys' fees or enhanced damages, the Resident Claimants require a higher showing of proof, by "clear and convincing" evidence and not just a "preponderance of the evidence." Welf. & Inst. Code § 15657.  The settlements proposed by the Debtors takes this applicable law into consideration as well.

1  **pre-petition**, the Debtors settled other resident claims alleging similar circumstances with those

2  settlements ranging between $125,000 and $750,000.[6]

3  **III.**

4  **THE BANKRUPTCY COURT IS REQUIRED TO ESTIMATE CLAIMS UNDER**

5  **SECTION 502(c) FOR VOTING PURPOSES IN ORDER TO AVOID UNDUE DELAY**

6  **IN THE ADMINISTRATION OF THE CASE**

7  Pursuant to 11 U.S.C. § 502(c), contingent or unliquidated claims **must** be estimated

8  when failure to do so would unduly delay the administration of the case.    Section 502(c)

9  provides, in pertinent part:

10  > "There shall be estimated for purpose of allowance under this section –

11  > (1) any contingent or unliquidated claim, the fixing or liquidation of
    which, as the case may be, would unduly delay the administration of the

12  > case..."

13  The estimation provisions of Section 502 are mandatory in nature, and impose upon the

14  Bankruptcy Court an affirmative duty to estimate any contingent or unliquidated claim, the

15  resolution of which would unduly delay the closing of the case.  *See In re Frontier Airlines, Inc.*,

16  137 B.R. 811 (D. Colo. 1992). Debtors submit that the Resident Claims herein fall within this

17  category of mandatory estimation.

18  Section 502(c) authorizes the Court to estimate a contingent or unliquidated claim for the

19  "purpose of allowance" of such claim.  The language of Section 502(c) does not expressly state

20  whether claims are estimated for voting purposes only, for voting and confirmation purposes, or

21  for all purposes, including distribution under a plan of reorganization. However, courts have

22  wide discretion to determine the appropriate method and purpose of the estimation. *See Bittner v.*

23  *Borne Chem. Co., Inc.,* 691 F.2d 134, 135–36 (3d Cir. 1982)); *In re Pac. Gas & Elec. Co.,* 295

24  B.R. 635, 642 (Bankr. N.D.Cal. 2003); *In re Trident Shipworks, Inc.*, 247 B.R. 513, 514 (Bankr.

25  M.D. Fla. 2000).

26  _____

27  [6] See, e.g., Proof of Claim No. 41 by Uhyrek ($125,000); Proof of Claim No.18 by Thomas
28  ($225,000); Proof of Claim No. 42, 43 and 45 by Sparks ($225,000 of which $75,000 was paid
pre-petition); and Proof of Claim No. 14 by Pimentel ($750,000).

Indeed, "[i]t is . . . well established that the estimation proceeding may be used . . . to determine the allowed amount for distribution purposes." *Id. See In re Falk*, 2013 WL 5405564, at \*7–8 (B.A.P. 9th Cir. 2013) (upholding estimation of claim at zero for distribution purposes). The Court explicitly held in *In re Frontier Airlines, Inc., supra*, 137 B.R. at 814, that "the phrase 'for purpose of allowance in § 502(c) is reasonably construed to encompass both the allowance and disallowance (through valuation at zero) of contingent or unliquidated claims." Thus, it is well within this Court's discretion to estimate the Resident Claims herein for purposes of distribution under the Plan, which is tantamount to the estimation process being binding on the Resident Claimants. ***However, at this time, the Debtors are only requesting that the Resident Claims be estimated for voting purposes only, in furtherance of plan confirmation.***

The Court's discretion to do so should be utilized in these cases because the Superior Court will not even *begin* the process of liquidating the Resident Claims for at least another year or potentially longer. Estimating these Resident Claims for voting purposes now will achieve 502(c)'s stated mission of avoiding unnecessary and inappropriate delay to the administration of these bankruptcy cases which includes confirmation of the Debtors' Plan.

## A.    The Resident Claims Are All Contingent And Unliquidated Claims.

When considering whether a claim is unliquidated, a court generally looks to whether the claim's value has been determined or the relative ease with which that value can be determined. *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 304 (2nd Cir. 1997). The Ninth Circuit Bankruptcy Appellate Panel has defined "liquidated claim" as a claim wherein the amount due can be readily determined with precision. *In re Sylvester*, 19 B.R. 671, 673 (B.A.P. 9th Cir. 1982); *In re Quintana*, 107 B.R. 234, 238 (B.A.P. 9th Cir. 1989). Un-litigated tort and quantum meruit claims are generally unliquidated because damages are not based on a fixed sum. *See Sylvester,* 19 B.R. at 673; *In re Nicholes*, 184 B.R. 82, 89 (B.A.P. 9th Cir. 1995). Based on this definition, the Resident Claims are unliquidated and therefore clearly subject to estimation by the Bankruptcy Court under Section 502(c).

**B.      Awaiting Resolution Of The Resident Claims In Another Court Would Unduly Delay The Administration Of The Debtors' Bankruptcy Cases.**

Under Section 502(c), estimation is appropriate where liquidation of a claim would "unduly delay" the administration of a debtor's case. Undue delay is not defined in the Bankruptcy Code, "rather, it is a problem 'whose solution ultimately rests on the exercise of judicial discretion in light of the circumstances of the case, particularly the probable duration of the liquidation process as compared with the future uncertainty due to the contingency in question.'" *Interco Incorporated v. ILGWU Nat'l Retirement Fund (Matter of Interco, Inc.)*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992), *quoting* 3 *Collier's on Bankruptcy* ¶502.03 (15th Ed. 1991).    Thus, a claim unduly delays administration of the bankruptcy estate where the liquidation of the claim in the original court would unnecessarily delay distribution to holders of allowed claims. *In re Continental Airlines Corp.*, 60 B.R. 903, 905-06 (Bankr. S.D. Tex. 1986). Here, estimation of the Resident Claims is required to facilitate a vote on confirmation of the Plan in order to commence distributions to other creditors holding allowed claims,[7] even though estimation is not required to calculate the amount of the distributions to holders of those other allowed claims.

Section 502(c) helps a court "avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions." *Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992).  In addition, it promotes the "fair distribution to creditors through a realistic assessment of uncertain claims." *Id.*

Under these circumstances, the Debtors submit that it is appropriate for the Court to assess the merits and estimate the Resident Claimants for the limited purpose of voting on the Plan in order to ensure that the proceedings on the Plan and distributions under the Plan are not unduly delayed.  *See In re Rhead*, 179 B.R. 169, 172-73 (Bankr. D. Ariz. 1995) (where a plan is

---

[7] Seven of the Resident Claimants filed lawsuits between July 2021 and June 2023, prior to the Debtors' acquisition of the facilities; and there is no pending lawsuit relating to the Melaragno Claim.  Thus, estimation is the only means of liquidating the Melaragno Claim at this point.

pending and depends on resolution of an unliquidated claim, proceedings other than estimation would cause undue delay).

Estimation of the Resident Claims will facilitate the most efficient, equitable and orderly conclusion of the Debtors' bankruptcy cases. *See In re Continental Airlines, Inc.*, 57 B.R. 842 (Bankr. S.D. Tex. 1985) (estimation process of section 502(c) was most appropriate, efficient and equitable method of concluding Chapter 11 case in orderly manner, and most effective method to accomplish statutory purpose in advancing ratable distribution of assets). Indeed, unless the Resident Claims are estimated now, confirmation and effectuation of the terms of the Plan will be not only be substantially delayed but will be impossible while the validity and extent of the Resident Claims are litigated. *In re Corey*, 892 F.2d 829 (9th Cir. 1989) (court could estimate claims of creditors who had voted against proposed plan of reorganization, given highly speculative nature of claims and undue delay which would otherwise result in confirmation of proposed plan); *In re Continental Airlines*, 57 B.R. at 844 (estimation was appropriate where liquidation of employee claims "would involve the unnecessary expenditure of enormous amounts of time, effort and money, by way of attorneys' fees inherently incurred in such litigation"). Only this Court can make an expedited determination of the disputed Resident Claims in order to avoid unnecessary delay and expense which would prejudice all creditors. Section 502(c) is expressly designed for this situation.

## C. The Bankruptcy Court Has Wide Discretion In Choosing The Method Of Estimating Claims Under 11 U.S.C. § 502(c).

Section 502(c) does not specify any particular procedure for the estimation of contingent or unliquidated claims. Bankruptcy courts have broad discretion to fashion estimation procedures using whatever method is best suited to the particular case at hand. *Bittner v. Borne Chemical Co., Inc.,* 691 F.2d 134, 135 (3d Cir. 1982); *In re Eagle Bus Mfg., Inc.,* 158 B.R. 421, 437 (S.D. Tex. 1993) (quoting *Addison v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir. 1984)); *In re Corey, supra*, 892 F.2d at 834; *In re Aspen Limousine Serv., Inc.*, 193 B.R. 325 (Bankr. D. Colo. 1996) (holding court should choose best method for

1   estimation in light of particular circumstances and affirming bankruptcy court's choice of

2   hearing through offers of proof).

3       When estimating a claim, a bankruptcy court is limited only by the legal rules which

4   govern the ultimate value of the claim.  *Bittner*, 691 F.2d at 135-36; *Brints Cotton Mktg., Inc.*,

5   737 F.2d at 1341.  The process by which the court must estimate a claim need not be lengthy or

6   involved.  "The methods used by courts have run the gamut from summary trials to full-blown

7   evidentiary hearings to a mere review of pleadings, briefs, and a one-day hearing involving oral

8   argument of counsel."  *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr.

9   E.D.N.Y. 1994) (citations omitted).

10      For example, in the case of *In re Lane*, 68 B.R. 609, 613 (Bankr. D. Hawaii 1986), the

11  Bankruptcy Court simply reviewed the pleadings and briefs of the parties involved.  As the court

12  of appeals held in *Bittner*, the "principal consideration [in determining the method for estimating

13  a claim under § 502(c) must be an accommodation to the underlying purposes of the Code.  It is

14  conceivable that in rare and unusual cases arbitration or even a jury trial on all or some of the

15  issues may be necessary to obtain a reasonably accurate evaluation of the claims [citation

16  omitted].  Such methods, however, usually will run counter to the efficient administration of the

17  bankrupt's estate and where there is sufficient evidence on which to base a reasonable estimate

18  of the claim, the bankruptcy judge should determine the value."  *Bittner*, 691 F.2d at 135-36.

19      **D.**      **The Resident Claims Should Be Estimated At The Proposed Amounts Set**

20      **Forth In The Disclosure Statement**

21      As for the standard for estimation, courts have held that, even when the amount of

22  damage is fixed, liquidated and undisputed, the estimation process should take into account the

23  likelihood that the claimant would prevail on the merits and apply that probability to the amount

24  of damage. *Windsor Plumbing*, 170 B.R. at 521-22; *In re Farley, Inc.*, 146 B.R. 748, 753 (Bankr.

25  N.D. Ill. 1992).  In assessing the probable success of a claim, courts have most often used

26  weighted probabilities as a standard.  *See Windsor Plumbing*, 170 B.R. at 521.  Many courts,

27  however, have effectively disallowed claims by estimating them at zero.  *See, e.g., In re Corey*,

28  *supra*, 892 F.2d at 834 (affirming estimation of speculative claim at zero); *In re Thomson*

1    *McKinnon Securities, Inc.*, 143 B.R. 612, 621 (Bankr. S.D.N.Y. 1992) (disallowing claim on

2    grounds it has no value); *Bittner*, 691 F.2d at 136-37 (bankruptcy court did not abuse its

3    discretion by estimating claims according to their ultimate merits and assigning a zero value to

4    those claims where it seemed more probable than not that the claims would ultimately fail in

5    another forum).

6           Although Section 502(c) mandates estimation of contingent and unliquidated claims,

7    there is no requirement that such estimation yield a positive number. *Frontier Airlines*, 137 B.R.

8    at 814 ("there is nothing in the statutory language which indicates that the estimation must yield

9    a positive value for the claim").  However, other than the Melaragno Claim, the Debtors are not

10   requesting estimation of the Resident Claims at zero, irrespective of the fact that Debtors

11   contend that they performed their duties in accordance with regulatory guideline and met their

12   standard of care. Instead, the Debtors have requested that the Resident Claims be estimated at

13   reasonable amounts in excess of zero given the various factors considered in addition to the fact

14   that the Resident Claims are heavily disputed by the Debtors.

15

16

| Claimant | Amount |
|---|---|
| Moreno Claim | $100,000.00 |
| Grigsby Claim | $50,000.00 |
| Hernandez Claim | $50,000.00 |
| Riley Claim | $100,000.00 |
| Madsen Claim | $50,000.00 |
| Gross Claim | $50,000.00 |
| Melaragno Claim | $0.00 |
| Orrick Claim | $50,000.00 |

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**THE RESIDENT CLAIMS CANNOT MEET THEIR BURDEN OF PROOF**

**FOR EITHER ELDER ABUSE OR GROSS NEGLIGENCE**

**A.    Elder Abuse Claims**

The majority of the claims asserted by the Resident Claimants is for elder abuse or elder neglect where the standard of proof is very high.  To prevail on an elder neglect cause of action pursuant to Welfare and Institutions Code § 15600 et seq., the Resident Claimants would have to prove that the facility staff committed "neglect" which is defined as the failure to provide appropriate medical care, protect from health hazards and/or prevent malnutrition or dehydration. Welf. & Inst. Code § 15610.57(b).  Further, the Resident Claimants would have to establish that this neglect was performed with a "conscious disregard" of the Resident Claimants' well-being or with "recklessness" by the Debtors' staff.  There is no evidence provided in any of the Proofs of Claims that would support such claims and the only evidence is to the contrary; namely, that the facilities met the requisite standard of care in treating the Resident Claimants, which undermines any potential damage claim.

Because the Debtors are a corporate employer, the Resident Claimants must further establish that a managing agent or officer of the facility performed, authorized or ratified the alleged reckless neglect.  This means that the Resident Claimants must establish that a managing agent (such as the Administrator or the Director of Nursing) took affirmative action to prevent the Resident Claimants from receiving the care and treatment which was ordered to be provided to them by their treating physician.  If a staff member failed to provide such ordered care, and the Administrator or Director of Nursing failed to rectify the situation, potentially that would be evidence of corporate ratification.  There is no evidence of such conduct here, nor is it even alleged in the Resident Claimants' pleadings of record. Accordingly, the Debtors contend that the Resident Claimants cannot meet their burden of proof.

The Elder Abuse Act defines neglect as "[t]he negligent failure of any person having the care or custody of an elder… to exercise that degree of care that a reasonable person in a like position would exercise." (Id., § 15610.57(a)(1).)  Neglect as a form of abuse under the Elder

Abuse Act refers "to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations." *Delaney v. Baker* (1999) 20 Cal.4th 23, 34. Thus, when the medical care of an elder or dependent adult is at issue, **the statutory definition of 'neglect'** speaks not of the undertaking of medical services, but of the **failure to provide medical care**." *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 783; see also *Id.* at p. 786 "statutory elder abuse may include the egregious withholding of medical care for physical and mental health needs." The definition of "neglect" was recently clarified as the abject failure to provide medical care. *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331. The concept of "neglect" under the Elder Abuse Act is not intended to apply to any conceivable negligent conduct that might adversely impact an elder or dependent adult. *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148. The evidence will show that the facilities met the required standard of care and engaged in conduct in compliance with applicable guidelines and regulations.

Furthermore, to recover the enhanced remedies available under the Elder Abuse Act from a health care provider, a plaintiff must prove more than simple or even gross negligence in the provider's care or custody of the elder. *Welfare & Institutions Code* § 15657.2; *Delaney, supra*, 20 Cal.4th at p. 32. The plaintiff must prove "by clear and convincing evidence" that "the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of" the neglect. *Welfare & Institutions Code* § 15657. Oppression, fraud and malice "involve 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injurious' nature." *Delaney*, at p. 31. "Recklessness" involves "'deliberate disregard' of the 'high degree of probability' that an injury will occur" and "rises to the level of a 'conscious choice of a course of action… with knowledge of the serious danger to others involved in it.'" *Id.* at pp. 31-32. Thus, the enhanced remedies are available only for "'acts of egregious abuse' against elder …adults." *Id.* at p. 35. "In order to obtain the Act's heightened remedies, a plaintiff must allege conduct essentially equivalent to conduct that would support recovery of punitive damages." *Covenant Care, supra* 32 Cal.4th at 789. Here, there are no allegations of any such egregious conduct, further undermining any merit to the Resident Claims.

1    *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396 is

2    instructive.   The plaintiff in *Carter* sued a skilled nursing facility ("SNF") and hospital for

3    wrongful death and elder abuse of her father.   She alleged the following facts: approximately

4    two months after undergoing hip surgery, Grant was admitted to the hospital for chest pain.   He

5    had no pressure ulcers at the time of that admission.   Two days later he was transferred to the

6    SNF for short-term rehabilitation.   He was generally in good health.   While at the Center,

7    plaintiff alleged that Grant was "continually neglected" in that he was left to air-dry after bathing

8    in front of an open window with a fan blowing on him, even during cold days.   Despite protests

9    from Grant's daughter, the practice of air-drying Grant continued.   Grant developed pneumonia,

10   pressure ulcers on his lower back and buttocks and sepsis.   Grant was admitted to the hospital for

11   a second time where he developed additional pressure ulcers.   Plaintiff alleged that the hospital

12   fraudulently and falsely maintained their records regarding the development of the additional

13   pressure ulcers.   Grant was released to the Center where the alleged mistreatment continued.

14   When Grant was admitted to the hospital for the third and final time, the hospital staff did not

15   give Grant life-saving medications, despite records to the contrary.   They also failed to properly

16   stock a "crash cart" and could not find the correct endotracheal tube, thus failing to intubate him

17   in time to save his life.   Despite all these facts, plaintiff's elder abuse claim against the hospital

18   was dismissed at the demurrer stage and was held to be insufficient to state a claim upon which

19   relief can be granted.   Moreover, plaintiff was not allowed leave to amend the complaint.   This

20   finding was upheld on appeal.

21       The Appellate Court in *Carter* noted that while the failure to provide proper antibiotics or

22   to locate the proper size endotracheal tube might constitute professional negligence, "absent

23   specific factual allegations indicating at least recklessness (i.e., a conscious or deliberate

24   disregard of a high probability of injury), neither failure constitutes abuse or neglect within the

25   meaning of the Elder Abuse Act [Citations.]." *Carter*, supra 198 Cal.App.4th at 408.   The

26   Appellate Court further pointed out that abuse includes abandonment and isolation and neglect

27   included failure to assist with hygiene, provide medical care or prevent dehydration. *Id*. at 410.

28   When looking at the facts exclusively attributed to the hospital in the *Carter* case — failure to

1    treat pressure ulcers, administer appropriate medications, failure to stock a crash cart, failure to

2    properly document care, and purposeful inadequate testing for medications — plaintiff's

3    contention that all those facts were "reckless" and "fraudulent" did not suffice to rise to the level

4    of neglect under the Elder Abuse Act.  *Id.*

5        Applying the foregoing legal principles of *Carter* to the Resident Claims here, there is

6    nothing in those pleadings or in the facility charts that indicate the Debtors did anything wrong,

7    much less even sufficiently egregious to constitute neglect (or any other form of abuse) within

8    the meaning of the Elder Abuse Act. The general physical condition and overall health of the

9    Resident Claimants was already compromised at the time of admission to the Debtors' facilities;

10    treatment orders were carried out by the staff; the Resident Claimants were routinely evaluated

11    by the staff.

12        The major complaint of "pressure sores" or skin breakdown was "unavoidable" per 42

13    Code of Federal Regulations § 483.25(c) because skin breakdown developed even though the

14    facilities evaluated such clinical conditions (where applicable) and defined and implemented

15    interventions that were consistent with their needs, goals and the recognized standards of

16    practice, monitored and evaluated the impact of the interventions as appropriate. 42 CFR

17    §483.25(c) only requires that "a resident having pressure sores receives necessary treatment and

18    services to promote healing, prevent infection and prevent new sores from developing."  The

19    Debtor facilities submit that they each provided all the treatment and services to the Resident

20    Claimants to meet the standard required in 42 CFR 483.25(c), i.e., they provided treatment and

21    services to promote healing, promote infection control and to promote the prevention of new

22    skin breakdown.  Conspicuously, the standard does not require healing, infection prevention or

23    prevention of new skin breakdown because that would be an impossible standard.  Here, the

24    Debtors believe that the applicable facilities have met the standard of care.

25        **B.    Negligence/Wrongful Death Resident Claims**

26        Some of the Resident Claimants have also asserted a cause of action for negligence or

27    wrongful death based upon professional negligence which must be established by a

28    preponderance of the evidence that the care provided by the staff at the applicable Debtors'

14

facility failed to meet the standard of care.  The Resident Claimants must also establish that the breach in the standard of care was a proximate and actual cause of the alleged injuries and subsequent death. It is the Resident Claimants' burden of proof to show by a preponderance of the evidence that defendant wrongfully acted or failed to act in a manner which proximately caused the injuries.  *Spencer v. Beatty Safeway Scaffold Company* (1956) 141 Cal.App.2d 875. The overwhelming evidence confirms that the Resident Claimants cannot meet their burden of proof.  Foremost, the Resident Claimants cannot prove causation and in fact in many instances, the death certificates (as applicable) confirm that the cause of death was one of the many ***other*** comorbidities that the Resident Claimants suffered from.

**V.**

**SUMMARY OF RESIDENT CLAIMANTS' CLAIMS**

**AND MEDICAL CONDITION**

As set forth in the Claim Summaries in the Amparo Declaration filed concurrently herewith, the Resident Claimants had substantial other comorbidities that impacted their health and impaired their medical condition, in some instances causing death.  A brief summary of the medical condition of each Resident Claimant and the basis for the Debtors' proposed estimation of an allowed unsecured claim for each Resident Claimant follows:

**1.  The Moreno Claim**

The Moreno Claim is set forth in a Complaint filed in January 2023 which contains boilerplate allegations regarding the care for Nicholas Mariano Moreno between August 2021 and April 16, 2022 culminating in Mr. Moreno's death two weeks later on April 28, 2022 after being transferred to the hospital. The prayer for relief seeks "damages according to proof."[8] Windsor Terrace disputes liability for the Moreno Claim given the numerous comorbidities documented in Mr. Moreno's medical history at the time of his admission to Windsor Terrace. For example, in July 2021, Mr. Moreno had a stroke which rendered him unable to live

---

[8] The Moreno Complaint is attached to the Moreno Proof of Claim which is Exhibit "A" to the Compendium of Exhibits. The Proof of Claim, however, asserts that damages are "no less than $1,750,000" but no evidence supporting such an amount is provided.

1  independently at home and was the primary reason he was admitted to Windsor Terrace.

2  However, at that same time, unfortunately, Mr. Moreno had other serious health issues and was

3  being treated for depression, type 2 diabetes, chronic kidney disease, arthritis, incontinence and

4  neuropathy. (See, Amparo Declaration at Exhibit "A.") He also took multiple psychotropic

5  medications related to agitation, hallucinations and depression. The Moreno Claim alleges that

6  Windsor Terrace failed to identify his risk for dehydration and failed to create any care plans or

7  implement any interventions related to this risk. On February 4, 2022, Mr. Moreno's physician

8  ordered Windsor Terrace to conduct lab work on February 7, 2022 which the facility did; the

9  results revealed an elevated blood urea nitrogen (BUN) and elevated creatinine.

10         On April 16, 2022, Windsor Terrace staff gave Mr. Moreno 200mg of Labetalol, his

11  regular blood pressure medication and dosage, causing Mr. Moreno's blood pressure to drop. He

12  was then transferred to the hospital, where he was admitted to the Intensive Care Unit with a

13  critically high BUN level, crucially high creatinine, hyperkalemia, severe metabolic acidosis and

14  acute metabolic encephalopathy and beta-blocker toxicity. (See, Amparo Declaration at Exhibit

15  "A.")  Mr. Moreno passed away on April 28, 2022 at the hospital.  Based on these allegations,

16  the Moreno Claim asserted four causes of action against the five defendants, only one of which

17  is the Debtor, Windsor Terrace: for (1) Dependable Adult Abuse; (2) Violation of Residents'

18  Bill of Rights; (3) Negligence; and (4) Wrongful death.

19         The Debtor contends that Mr. Moreno was an extremely ill individual who was nearing

20  the end of life when he was initially admitted to Windsor Terrace following his stroke and that

21  he died, not because of any negligent act or omission on the part of Windsor Terrace, but rather

22  as the result of the natural progression of his multiple serious, chronic, progressive and life-

23  threatening medical conditions as outlined above, in spite of the facility's best efforts to provide

24  appropriate, diligent and compassionate life-prolonging care and treatment. The Debtor

25  contends that it provided care to Mr. Moreno in accordance with applicable guidelines and

26  regulations and met its standard of care.

27

28

1      **2.  The Grigsby Claim**

2          The Grigsby Claim is set forth in the Complaint filed in July 2021, alleging elder neglect

3   and willful and reckless misconduct during the approximately 2 years that Luckie Grigsby

4   resided at Windsor Cheviot between 2017 when he was admitted and November 24, 2019, when

5   he died at the age of 91 years old from cardiopulmonary arrest.   The Proof of Claim filed on

6   behalf of the Grigsby Claim attaches invoices outlining all of the expenses related to medical

7   care and treatment provided to Mr. Grigsby, including cardiac care, a semi-private room on more

8   than one occasion, and all of the medications prescribed and administered to Mr. Grigsby over

9   the period of time he was a resident at Windsor Cheviot.   However, there is no indication that

10  any of the expenses relating to the care and treatment provided to Mr. Grigsby is an item of

11  damage, or even recoverable.  Instead, the Proof of Claim alleges just over $2,000,000, without

12  substantiation or foundation. (See, Amparo Declaration at Exhibit "B" and Compendium of

13  Exhibits at Exhibit "B.")

14         The primary allegations of the Complaint relate to Mr. Grigsby's development of

15  multiple pressure ulcers, and a purported failure of the facility's nursing staff to provide

16  adequate hydration and nutrition. There is no claim for wrongful death in the Complaint.  (See,

17  Compendium of Exhibits at Exhibit "B.")

18         Mr. Grigsby's medical records maintained by the facility contain numerous nutritional

19  assessments, supplements, and weight monitoring by Windsor Cheviot, as well as documentation

20  of Mr. Grigsby informing Windsor staff that he "was full," did not have an appetite, and had

21  eaten as much as he was able. (See, Amparo Declaration at Exhibit "B.")  Between October and

22  November 2019, Mr. Grigsby was transferred back and forth between the facility and the

23  hospital a few times for treatment relating to chest pains and septic shock.  During one of his

24  trips to the hospital in October 2019, the hospital performed a gastrectomy (stomach removal) on

25  Mr. Grigsby, and placed him on a feeding tube. The medical documentation shows that the

26  Windsor staff carried out the physician's orders for feeding and hydration in accordance with all

27  protocol for a feeding tube.  (See, Amparo Declaration at Exhibit "A.")  Relatedly, the facility

28

records show that Mr. Grigsby's pressure wounds were regularly treated by staff and that various wounds developed during the time that Mr. Grigsby was hospitalized.

The Debtor contends that Mr. Grigsby was an extremely ill individual who died, not because of any negligent act or omission on the part of Windsor Cheviot, but rather as the result of the natural progression of multiple serious, chronic, progressive and life-threatening medical conditions as outlined above, including his advanced age, in spite of the facility's best efforts to provide appropriate, diligent and compassionate life-prolonging care and treatment.

### 3.  The Hernandez Claim

The Hernandez Claim is set forth in the Complaint filed in May 2023, alleging dependent adult abuse and negligence and violation of Residents' Bill of Rights based upon Mr. Hernandez's fall outside of the Windsor Vallejo facility almost one year earlier, in May 2022. The prayer for relief seeks "damages according to proof."[9]   In order to prove a claim for Elder Abuse and Neglect, a plaintiff must prove that the defendant (1) had the responsibility for meeting the basic needs of the elder, such as medical care or hygiene care, (2) knew of the elder's dependent condition, (3) demonstrated a significant pattern of withholding such care, either with knowledge that an injury was substantially certain to befall the elder or with conscious disregard of the high probability of such injury, and (4) a plaintiff must prove that the neglect caused the elder to suffer pain, mental suffering or physical harm. *Carter v. Prime Healthcare Paradise Valley* (2011) 198 Cal.App.4th 396; Welf. & Inst. Code §§15610.07(a) and (b).

Debtor does not believe that Mr. Hernandez, a 60-year old man, can meet his burden of proof to establish any claim.  Indeed, in addition to the requirement to establish a significant pattern of withholding care, to recover the enhanced remedies afforded under the Elder Abuse Act, a plaintiff must prove, by clear and convincing evidence, "more than simple or even gross negligence in the provider's case or custody" of the elder. Welf. & Inst. Code §15657.2;

_____

[9] The Hernandez Complaint is attached to the Hernandez Proof of Claim which is Exhibit "C" to the Compendium of Exhibits. The Proof of Claim, however, asserts that damages are $1,000,000 but no evidence supporting such an amount is provided.

*Delaney v. Baker* (1999) 20 Cal.4th 23, 32*; Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 88.  As such, the enhanced remedies provided under an Elder Abuse and Neglect cause of action are only for "acts of egregious abuse against elder and dependent adults." Delaney, *supra* at 31.  No such allegations are provided and the boilerplate Complaint is extremely vague and brief in the factual allegations regarding Mr. Hernandez and there is not enough information to draw any conclusions concerning the fault of Windsor Vallejo, or even the extent of Mr. Hernandez' "pain and suffering."  However, the facility records show that Mr. Hernandez was regularly treated by staff in accordance with applicable guidelines and regulations.

### 4.  The Riley Claim

The Riley Claim is set forth in the Complaint alleging statutory elder abuse and negligence filed in February 2023, based upon a 23 day stay at Windsor Court from April 25, 2022 through May 17, 2022, relating to injuries Mr. Riley, an 82-year old man, sustained from a fall while at the facility, and general allegations that the Windsor staff did not provide adequate care to Mr. Riley, including by failing to rotate Mr. Riley in bed, causing him to suffer bed sores. (See, Compendium of Exhibits at Exhibit "D.")    The Complaint further alleges that Windsor concealed the bed sores from Mr. Riley's family, and discouraged them from seeking a higher level of care for Mr. Riley. The prayer for relief seeks "damages according to proof."[10]

There is nothing in Mr. Riley's allegations or in the facility chart that the facility did anything wrong, much less even sufficiently egregious to constitute neglect (or any other form of abuse) within the meaning of the Elder Abuse Act. Mr. Riley's physical condition and overall health was extremely compromised upon his admission, including hypertension, hyperlipidemia, chronic pain and insomnia. (See, Amparo Declaration at Exhibit "D.")  Mr. Riley's skin breakdown was "unavoidable" per 42 Code of Federal Regulations § 483.25(c) because skin breakdown developed even though the facility evaluated his clinical condition and pressure ulcer risk factors, and during his limited time at the facility, defined and implemented interventions

---

[10] The Riley Complaint is attached to the Riley Proof of Claim which is Exhibit "D" to the Compendium of Exhibits.  The Proof of Claim, however, asserts that damages are $1,000,000 but no evidence supporting such an amount is provided.

that were consistent with his needs, goals and the recognized standards of practice, monitored and evaluated the impact of the interventions and revised her Care Plans as appropriate. 42 CFR § 483.25(c) only requires that "a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing." The facility contends that it provided all the treatment and services to Mr. Riley to meet the standard required in 42 CFR 483.25(c). Conspicuously, the standard does not require healing, infection prevention or prevention of new skin breakdown because that would be an impossible standard. Relatedly, the facility records show that Mr. Riley's pressure wounds were regularly treated by staff and that various wounds developed during the time that Mr. Riley was hospitalized. (See, Amparo Declaration at Exhibit "D.")

### 5.  The Madsen Claim

The Madsen Claim is set forth in the Complaint filed in January 2023, alleging elder abuse / neglect, negligence and violation of Residents' Bill of Rights. Ms. Madsen, a 68-year old woman, was admitted to the Windsor the Ridge facility three separate times: (1) March 11, 2020 to December 31, 2020; (2) June 19, 2021 to August 3, 2021; and (3) January 25 – 27, 2022. The prayer for relief seeks "all legally recoverable compensatory, special, consequential and related damages according to proof as presented at trial of this matter."[11]

At the time of her admission, Ms. Madsen presented with coronary artery disease, acute kidney injury, osteomyelitis, hypertension, dementia, depression, osteoporosis, COPD and encephalopathy, in addition to having just sustained injuries resulting from a fall prior to her first admission when Ms. Madsen fractured parts of her spine and required toe amputations. (See, Amparo Declaration at Exhibit "E.")  Following her hospitalization for these pre-existing injuries, Ms. Madsen was discharged to Windsor the Ridge.

Ms. Madsen contends that she was a high fall risk, and had several fall incidents that occurred during Ms. Madsen's stay at Windsor the Ridge, including a hip fracture in January

---

[11] The Madsen Complaint is attached to the Madsen Proof of Claim which is Exhibit "E" to the Compendium of Exhibits.  The Proof of Claim, however, asserts that damages are $2,000,000 but no evidence supporting such an amount is provided.

2022.   However, Debtor's records indicate that Ms. Madsen's bed was maintained in a low position and as an extra precaution, a fall mat was placed on both sides of Ms. Madsen's bed, which was in accordance with applicable guidelines and regulations, and satisfied the facility's standard of care. (See, Amparo Declaration at Exhibit "E.")

In order to prove a claim for Elder Abuse and Neglect, a plaintiff must prove that the defendant (1) had the responsibility for meeting the basic needs of the elder, such as medical care or hygiene care, (2) knew of the elder's dependent condition, (3) demonstrated a significant pattern of withholding such care, either with knowledge that an injury was substantially certain to befall the elder or with conscious disregard of the high probability of such injury, and (4) a plaintiff must prove that the neglect caused the elder to suffer pain, mental suffering or physical harm.   *Carter v. Prime Healthcare Paradise Valley* (2011) 198 Cal.App.4th 396; Welf. & Inst. Code §§15610.07(a) and (b); §15657.   Debtor does not believe that Ms. Madsen can meet her burden of proof to establish any claim.   Indeed, in addition to the requirement to establish a significant pattern of withholding care, to recover the enhanced remedies afforded under the Elder Abuse Act, a plaintiff must prove, by clear and convincing evidence, "more than simple or even gross negligence in the provider's case or custody" of the elder. Welf. & Inst. Code §15657.2; *Delaney v. Baker* (1999) 20 Cal.4th 23, 32*; Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 88.   As such, the enhanced remedies provided under an Elder Abuse and Neglect cause of action are only for "acts of egregious abuse against elder and dependent adults." Delaney, *supra* at 31.   While the parties dispute whether Ms. Madsen was a "moderate" or "high" fall risk, the records show that the facility took active steps to ensure fall prevention care by keeping the bed in a low position and having soft mat on both sides of the bed.   (See, Amparo Declaration at Exhibit "E.")

Windsor the Ridge has several defenses, the most notable of which appear to be: (1) statute of limitations bars alleged harms during the March 11, 2020 through December 31, 2020 admission and some or all during the June 19, 2021 through August 3, 2021 admission; (2) third-party liability while Ms. Madsen was in the care of others; (3) consent to treatment; (4) natural course of disease or condition; and (5) the MICRA cap on non-economic losses.

### 6. **The Gross Claim**

The Gross Claim is set forth in two Complaints filed in May 2022 (and consolidated on January 10, 2023), alleging elder abuse / neglect, negligence and violation of Residents' Bill of Rights. The prayer for relief seeks "general damages in the form of loss of care, comfort and society according to proof; and also special damages including but not limited to funeral and burial expenses according to proof."[12] Plaintiff alleges that Ms. Gross was admitted to Windsor Gardens on multiple occasions over the course of six years (between 2015 and 2021), presenting with many serious pre-existing conditions including: atrial fabulation, coronary artery disease, STEMI (which is the most severe type of a heart attack), hypertension, dementia, atrophy, malnutrition, anemia, cataracts, bipolar disorder, COPD, hyperthyroidism, kidney failure, heart failure, pancolitis, and in one of the later admissions to the facility, COVID. However, the instant dispute concerns the limited period from June 18, 2019, up until Ms. Gross' discharge almost two years later on May 22, 2021. (See, Amparo Declaration at Exhibit "F.")

The basis for the action is the purported failure of Windsor Gardens to comply with a doctor's orders for testing chemical markers related to Ms. Gross' thyroid, and the alleged failure to provide her care and treatment. (See, Compendium of Exhibits at Exhibit "F.") These include but are not limited to issues concerning Ms. Gross' nutrition, hydration, and skin care. It is further alleged that certain medicine treating Ms. Gross' hypothyroidism (Levothyroxine) should not have been discontinued when Ms. Gross' hypothyroidism appeared to be subsiding. Instead, Ms. Gross contends that the medicine should have been "held" pending new test results, and the medication automatically restarted. However, Plaintiff alleges that no further tests of Ms. Gross' thyroid were ordered from July 7, 2020 to May 1, 2021. In the two consolidated lawsuits, Ms. Gross named as additional defendants multiple doctors and pharmacists, as well as S&F Management Company. (See, Compendium of Exhibits at Exhibit "F.")

---

[12] The Gross Complaint is attached to the Gross Proof of Claim which is Exhibit "F" to the Compendium of Exhibits. The Proof of Claim, however, asserts that damages are $1,300,000 but no evidence supporting such an amount is provided.

It is alleged that despite the fact that co-defendant Dr. Liu ordered another "TSH lab", Windsor Gardens failed to actually follow the order for that lab, and that there was no follow up by Dr. Liu.  Ms. Gross contends that this constituted Windsor Gardens withholding care from Ms. Gross, and that as a result, Ms. Gross' hypothyroidism went untreated, which damaged her kidneys, and led to a urinary tract infection, which ultimately led to Ms. Gross' death at the age of 94. (See, Amparo Declaration at Exhibit "F.")

Ms. Gross admits that she had a history of all of these various and serious ailments at the time she was admitted to Windsor Gardens.  These pre-existing conditions support a "natural course of disease" defense.  Moreover, Ms. Gross also admits that she was in the care of Windsor Gardens for a fairly extended period of time, namely between June 18, 2019, and May 22, 2021 which supports the argument that Windsor Gardens did not breach any duties at all to Ms. Gross, and instead Windsor Gardens was able to care for a sick and elderly person for multiple years, despite the serious maladies presented.  The records show that the facility took active steps to ensure the care and treatment of Ms. Gross was in accordance with applicable guidelines and regulations, and satisfied the facility's standard of care.

**7.  The Melaragno Claim**

The Melaragno Claim is set forth in Proof of Claim Nos 143, 145 and 146 for wrongful death and violation of various state and federal statutes. No complaint was filed; and the Proofs of Claim (all of which are identical) lack any specific dates during which Ms. Melaragno was a resident at Windsor Terrace.

Substantively, the facts alleged in the Melaragno Claims concern the care for Ms. Melaragno who was transferred directly to the facility from a hospital, and arrived in poor condition, on a ventilator with both a cuffed tracheostomy tube and a G-tube (enteral feeding tube), and suffered from serious medical conditions including sepsis and highly contagious C. Difficle diarrhea. (See, Amparo Declaration at Exhibit "G.")  There is no information provided as to why the hospital would discharge Ms. Melaragno to a facility in such an impaired condition.  While there is a general allegation that Windsor Terrace was a substandard poorly managed, understaffed and dirty facility, and did not have sufficient skill or supplies to handle

1    the condition of Ms. Melaragno, no actual specifics are provided regarding these allegations and

2    it is entirely unclear how long Ms. Melaragno resided at Windsor Terrace before she was

3    transferred back to the hospital where she later died. No evidence is provided with the

4    Melaragno Claims to substantiate any of the allegations. (See, Compendium of Exhibits at

5    Exhibit "G.")  Accordingly, this claim was estimated at zero.

6        **8.  The Orrick Claim**

7        The Orrick Claim is set forth in the Complaint filed in June 2023, alleging elder abuse,

8    fraud and negligent infliction of emotional distress. Substantively, the allegations are that Mr.

9    Orrick was a resident at another, unrelated skilled nursing facility known as Trestles, LLC dba

10   City Creek Post-Acute ("Trestles") from July 28, 2022, to August 17, 2022.  The Complaint

11   filed in June 2023 includes claims alleged against Trestles as well as other defendants.  (See,

12   Compendium of Exhibits at Exhibit "H.") The prayer for relief seeks "general damages and

13   special damages according to proof."[13]

14       At the time of his admission to Trestles, Mr. Orrick admits that he had various serious

15   medical conditions including hypertension, fracture of rib and various other ailments.  Plaintiffs

16   allege that Mr. Orrick was a dependent adult, and had high risk for failing, choking on food,

17   skin breakdowns, malnutrition, dehydration, and for various other infections such as UTIs.  It is

18   alleged that Mr. Orrick suffered from severe lack of care while he was a resident at Trestles, and

19   that his condition was severely worse after his stay at Trestles. Because of this poor care at

20   Trestles, on August 17, 2022 Mr. Orrick was transferred to Windsor Sacramento. (See,

21   Compendium of Exhibits at Exhibit "H.")

22       At the time of his admission to Windsor Sacramento, on August 17, 2022 Mr. Orrick

23   was diagnosed with hypertension, major depressive disorder, muscle weakness, unsteadiness on

24   feet, retention of urine, and he remained a high risk for fall due to his "psychoactive drug use"

25   and had an unsteady gait, incontinence of bowel and bladder, in addition to the injuries he

26

27   _____

28   [13] The Orrick Complaint is attached to the Orrick Proof of Claim which is Exhibit "H" to the
     Compendium of Exhibits.  The Proof of Claim similarly asserts that damages are "unknown."

1  suffered while at Trestles. (See, Amparo Declaration at Exhibit "H.")  Mr. Orrick alleges that

2  Windsor Sacramento was not adequately staffed, and that his calls for assistance were habitually

3  ignored.  The Complaint alleges that Mr. Orrick suffered harm as a result, which included

4  chronic thirst, hunger, infections, and discomfort, as well as severe weakening of Mr. Orrick's

5  overall condition, and bed sores.  These are the same complaints Mr. Orrick had while at

6  Trestles, confirming that this condition pre-existed his arrival at Windsor Sacramento.  In the

7  Complaint, even though the first 40 or so pages outlines the alleged malfeasance of the former

8  facility, Trestles, where Mr. Orrick resided, the Complaint alleges at paragraph 92(b) that Mr.

9  Orrick "was nourished at the time of admission to the subject facility and enjoyed visiting with

10  friends and family" and at paragraph 92(e) that Mr. Orrick's "medical condition was stable and

11  skin was intact" which could not possibly be true given the allegations in the prior 90

12  paragraphs about Mr. Orrick's condition having resided at Trestles. (See, Compendium of

13  Exhibits at Exhibit "H.")

14      Indeed, according to the allegations in paragraph 19(a) – (k) of the Complaint, while at

15  Trestles (the other non-Debtor facility where Mr. Orrick was a resident), Mr. Orrick, *inter alia*,

16  suffered from chronic thirst, hunger, infections and discomfort; weight loss, malnutrition,

17  weight loss, bed sores and other skin wounds which "otherwise destroyed [Mr. Orrick's] quality

18  of life;" suffered a significant head injury due to a fall at Trestles, and eventually fell at Trestles

19  causing Mr. Orrick's hip to break, requiring Mr. Orrick to undergo pelvis surgery.  This is the

20  impaired condition that Mr. Orrick was in at the time he arrived at Windsor Sacramento.  (See,

21  Amparo Declaration at Exhibit "H.")

22      Mr. Orrick includes a claim for elder abuse, a claim for negligent infliction of emotional

23  distress, and several claims for fraud.  The basis of the fraud claims is that Windsor Sacramento

24  represented that it would be able to take care of Mr. Orrick while he was residing there, and Mr.

25  Orrick claims that it turned out to not be true because he alleges that Windsor Sacramento had

26  insufficient staff, insufficient training of staff, and a lack of "qualified staff" to prevent Mr.

27  Orrick's falls. (See, Amparo Declaration at Exhibit "H.")

28

1     Windsor Sacramento will be able to set forth various defenses to this claim, the most

2 notable among which appear to be: (1) third party liability (i.e., Trestles); and (2) the MICRA

3 cap on non-economic damages.  Mr. Orrick will also have to introduce much more evidence to

4 carry his burden to prove breach and causation by Windsor Sacramento.  The facility records

5 show that Mr. Orrick was regularly cared for and treated by staff in accordance with applicable

6 guidelines and regulations.

7     Mr. Orrick also seeks to allege three causes of action for fraud.  To prevail on the fraud

8 claims, Mr. Orrick will have to carry his burden on all elements of fraud.  This includes the

9 "scienter" element, which means that Mr. Orrick will have to show by clear and convincing

10 evidence that Windsor Sacramento *intentionally misled* Mr. Orrick when it made representations

11 about the facility.  Mr. Orrick will also have to show reasonable and actual reliance on such

12 alleged misrepresentations.  There is no evidence sufficient to support these allegations.

13 **VI.**

14 **<u>CONCLUSION</u>**

15     For all the reasons set forth herein, the Debtors respectfully request that the Court enter

16 an Order estimating the amount of the Resident Claims for voting purposes only in the sum of

17 the following:

| Claimant | Amount |
|---|---|
| Moreno Claim | $100,000.00 |
| Grigsby Claim | $50,000.00 |
| Hernandez Claim | $50,000.00 |
| Riley Claim | $100,000.00 |
| Madsen Claim | $50,000.00 |
| Gross Claim | $50,000.00 |
| Melaragno Claim | $0.00 |
| Orrick Claim | $50,000.00 |

1

2  Dated:  June 21, 2024 LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.

3

4                                      By:_____

5                                           RON BENDER
                                             BETH ANN R. YOUNG
6                                            MONICA Y. KIM
                                             JULIET Y. OH
7                                            ROBERT M. CARRASCO
                                      Attorneys for Debtors and Debtors in Possession
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **NOTICE OF OMNIBUS MOTION AND OMNIBUS MOTION BY DEBTORS PURSUANT TO 11 U.S.C. §§ 105 AND 502(c) FOR ESTIMATION OF UNLIQUIDATED CLAIMS FOR VOTING PURPOSES ONLY AS TO THOSE PROOFS OF CLAIMS ("POC") FILED BY CLAIMANTS: (1) MORENO [POC NO. 69]; (2) GRIGSBY [POC NO. 2-1]; (3) HERNANDEZ [POC NO. 85]; (4) RILEY [POC NO. 69]; (5) MADSEN [POC NO. 13-1]; (6) PRZEBINDA / GROSS [POC NO. 68-1]; (7) MELARAGNO, RINGGOLD and LOCKHART [POC NOS. 143, 144, 146]; (8) ORRICK [POC NO. 34-1]; DECLARATION OF CLARO BUDGIE AMPARO AND COMPENDIUM OF EXHIBITS FILED CONCURRENTLY HEREWITH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 21, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Katalina Baumann     Katalina.Baumann@troutman.com,
  evelyn.duarte@troutman.com,LitigationDocketRequests@troutman.com,elizabeth.streible@troutman.com,Hilary.Barton@Troutman.com,OCCcourtnotices@troutman.com,Susan.Henry@Troutman.com
- Christopher Dale Beatty     chris.beatty@katten.com,
  marsha.davis@katten.com,courtalertlax@katten.com
- Reem J Bello     rbello@goeforlaw.com, kmurphy@goeforlaw.com
- Ron Bender     rb@lnbyg.com
- Katherine Bunker     kate.bunker@usdoj.gov
- Joseph E Caceres     jec@locs.com, generalbox@locs.com
- Robert Carrasco     rmc@lnbyg.com, rmc@lnbyg.com
- Louis J. Cisz     lcisz@nixonpeabody.com, jzic@nixonpeabody.com
- Andrew Michael Cummings     andrew.cummings@hklaw.com,
  philip.dobbs@hklaw.com;hapi@hklaw.com;reena.kaur@hklaw.com
- Eryk R Escobar     eryk.r.escobar@usdoj.gov
- M Douglas Flahaut     flahaut.douglas@arentfox.com
- Eric J Fromme     eric.fromme@afslaw.com, yvonne.li@afslaw.com;kevin.chen@afslaw.com
- Jeffrey Garfinkle     jgarfinkle@buchalter.com,
  docket@buchalter.com;lverstegen@buchalter.com
- Robert P Goe     kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com
- Vanessa M Haberbush     vhaberbush@lbinsolvency.com,
  dhaberbush@lbinsolvency.com,ahaberbush@lbinsolvency.com,abostic@lbinsolvency.com,haberbush.assistant@gmail.com,jborin@lbinsolvency.com,lbogard@lbinsolvency.com
- Mark S Horoupian     mark.horoupian@gmlaw.com,
  mhoroupian@ecf.courtdrive.com;cheryl.caldwell@gmlaw.com;karen.files@gmlaw.com
- Brandon J. Iskander     biskander@goeforlaw.com, kmurphy@goeforlaw.com
- Eric P Israel     eisrael@danninggill.com, danninggill@gmail.com;eisrael@ecf.inforuptcy.com
- Robbin L. Itkin     ritkin@sklarkirsh.com,
  mduran@sklarkirsh.com;KFRAZIER@SKLARKIRSH.COM
- Lior Katz     lior@katzlaw.com
- Christian T Kim     ckim@dumas-law.com, ckim@ecf.inforuptcy.com
- Monica Y Kim     myk@lnbyg.com, myk@ecf.inforuptcy.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                      **F 9013-3.1.PROOF.SERVICE**

- Robert S Marticello    rmarticello@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com
- Kevin J McEleney    kmceleney@uks.com, kgauthier@uks.com
- Thomas Glenn Crooks Mclaughlin    tgm@lrplaw.net, patricia@lrplaw.net
- David M Medby    dmedby@lawgarcia.com, jmobley@lawgarcia.com
- Nicholas Miller    nick.miller@hklaw.com, annmarie.jezisek@hklaw.com
- Roksana D. Moradi-Brovia    Roksana@rhmfirm.com, matt@rhmfirm.com;rosario@rhmfirm.com;sloan@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;russ@rhmfirm.com
- Jeff David Neiderman    jneiderman@jayrothmanlaw.com
- Juliet Y. Oh    jyo@lnbyg.com, jyo@lnbyb.com
- Aron M Oliner    roliner@duanemorris.com
- Robert J Pfister    rpfister@pslawllp.com
- Julie H Rome-Banks    julie@bindermalter.com
- Mary H Rose    mrose@buchalter.com, marias@buchalter.com;docket@buchalter.com
- Terrel Ross    tross@trcmllc.com
- Joseph A Sakay    jsakay@buchalter.com, kcb@hcmp.com;kim.mckenzie@hcmp.com
- Gregory M Salvato    gsalvato@salvatoboufadel.com, calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com
- Lovee D Sarenas    lovee.sarenas@dinsmore.com, michael.kerr@dinsmore.com
- Paul Anthony Saso    psaso@pslawllp.com
- Daren M Schlecter    daren@schlecterlaw.com, assistant@schlecterlaw.com
- Lindsey L Smith    lls@lnbyg.com, lls@ecf.inforuptcy.com
- Derrick Talerico    dtalerico@wztslaw.com, maraki@wztslaw.com,sfritz@wztslaw.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
- Kenneth K Wang    Kenneth.Wang@doj.ca.gov, Anthony.Conklin@doj.ca.gov
- Beth Ann R. Young    bry@lnbyg.com, bry@lnbyb.com
- Joshua del Castillo    jdelcastillo@allenmatkins.com, mdiaz@allenmatkins.com

**2. SERVED BY UNITED STATES MAIL**: On **June 21, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ *Additional service list attached.*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 21, 2024**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ *Additional service list attached.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 21, 2024 | Rebecka Merritt | /s/ Rebecka Merritt |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**

Windsor Terrace Healthcare, LLC
(10144)
**Service via US Mail**

Honorable Victoria S. Kaufman
United States Bankruptcy Court
21041 Burbank Boulevard,
Suite 354 / Courtroom 301
Woodland Hills, CA 91367

Anthony Lanzone, Esq.
Lanzone Morgan, LLP
356 Redondo Avenue
Long Beach, CA 90814
*Counsel for Creditor*

Brian S Van Allen, Esq.
Belgum, Fry & Van Allen, LLP
1905 E. Route 66, Suite 102
Glendora, CA 91740
*Counsel for Creditor*

Spencer E. Peck
Peck Law Corporation
2655 First Street, Suite 250
Simi Valley, CA 93065
*Counsel for Creditor*

Lukas Pick
Pick Law
2251 San Diego Ave, B-105
San Diego, CA 92110
*Counsel for Creditor*

Harlan Joseph Zaback
Berman & Riedel, LLP
12264 El Camino Real, Suite 300
San Diego, CA 92130
*Counsel for Creditor*

Tom Allen
Allen Saltzman LLP
28991 Old Town Front Street, Suite 201
Temecula, CA 92590
*Counsel for Creditor*

James R. Selth
11766 Wilshire Blvd, Suite 450
Los Angeles, CA 90025
*Counsel for Creditor*

Thomas G. McLaughlin
McLaughlin Dixon LLP
428 J St., 4th Floor
Sacramento, CA 95814
*Counsel for Creditor*

Nina Ringgold
17901 Malden St
Northridge, CA 91325

Justin Ringgold-Lockhart
17901 Malden St
Northridge, CA 91325

Haberbush, LLP
444 W. Ocean Blvd, Suite 1400
Long Beach, CA 90802

**<u>VIA EMAIL</u>**

Lane Bogard: [lbogard@lbinsolvency.com](mailto:lbogard@lbinsolvency.com)

***Counsel for Nicholas Martin Moreno***


Brian Van Allen: **[brian@belgumlaw.com](mailto:brian@belgumlaw.com)**

***Counsel for Timothy Grigsby***


Spencer Peck: [speck@pecklawcorp.com](mailto:speck@pecklawcorp.com)

***Counsel for Sergio Hernandez***


Lukas Pick: [lpick@picklaw.com](mailto:lpick@picklaw.com)

***Counsel for Terrance Riley***


Harlan Zaback: [hzaback@bermanlawyers.com](mailto:hzaback@bermanlawyers.com)

***Counsel for Betsy Madsen***


Allen Saltzman: [Office@allensaltzman.com](mailto:Office@allensaltzman.com)

***Counsel for Irene Przebinda***


James Selth: [jselth@wztslaw.com](mailto:jselth@wztslaw.com)

***Counsel for Justin Ringgold-Lockhart***


Thomas G C. McLaughlin: [info@mdxlaw.com](mailto:info@mdxlaw.com)

***Counsel for Jerry Orrick and Joe Orrick***